Mack Erwin Idle, Appellant, v. Charles W. Moody, Trustee, and Carroll Pettefer.—127 S. W. (2d) 660.

Division One, May 2, 1939.*

*NOTE: Opinion filed at September Term, 1938, April 1, 1939; motion for rehearing filed; motion overruled at May Term, 1939, May 2, 1939.

*Price Wickersham* and *Ben R. Estill* for appellant.

*O. J. Page, Arch A. Johnson* and *Wm. L. Vandeventer* for respondents.

FERGUSON, C.—This is a statutory will contest. [Sec. 537, R. S. 1929.] The contest is directed to the validity of a codicil to the will of Mary J. Carroll, a resident of Springfield, Missouri, who died May 14, 1936. The cause was tried in the Circuit Court of Greene County. A jury having been waived, the trial court made a finding sustaining the will and the codicil, and, in accordance with the finding, entered judgment establishing such instruments as the last will and testament of the said Mary J. Carroll. Plaintiffs, or contestants, have appealed. As will appear the disposition of the residuary es-

tate is involved and the value thereof is such as to give this court jurisdiction of the appeal.

On January 19, 1935, Mrs. Carroll executed a will, whereby, after making numerous specific bequests and devises, she bequeathed and devised "all the remainder of" her "property, real, personal and mixed, and wherever situate to;" (1) Carroll Pettefer, a grandson; (2) Barbara Maude Pettefer, a granddaughter; (3) George H. Idle, a brother; (4) Leonard Idle, a nephew; (5) Ruby Idle Dearing, a niece; and (6) Mack Erwin Idle, a nephew, the sole plaintiff herein. Specific devise is made to each of the residuary beneficiaries. On July 10, 1935, Mrs. Carroll executed a codicil to her will of January 19, 1935, the validity of which is put in issue by this action. First referring to the execution of her will of January 19, 1935, the codicil then reads, as follows:

"Whereas, by my said will I had by various gifts, legacies and devises directed the disposition of all of my property upon my death, and whereas, I have exchanged some of my property for other property and also desiring to preserve certain parts of my property for my grandson, Carroll Pettefer,

"Now, I hereby give, devise and bequeath to Charles W. Moody, of Springfield, Missouri, the Clark M. Howell and C. H. Frederick note secured by a Deed of Trust recorded in Book 628, Page 315 in the office of the Recorder of Deeds of Greene County, Missouri, and all the rest, residue and remainder of my estate, both real and personal, which remains after the payment and settlement of all specific bequests and devises made in my will dated the 19th day of Jan., 1935, to take, hold, receive, manage, invest and reinvest the same and to pay the income thereof to my grandson, Carroll Pettefer, until he shall attain the age of thirty years, and when he shall attain that age to pay over and transfer to him the principal fund so held in trust.

"I ratify and confirm my said will in everything except where the same is hereby altered as aforesaid.

"In witness whereof, I have hereunto subscribed my name this 10th day of July, 1935.

"(Signed) Mary J. Carroll."

It will be noted that, whereas the will of January 19, 1935, gave the residuary estate, in equal parts, to the six persons above named, one part being devised and bequeathed to Carroll Pettefer, the grandson, and one part to the plaintiff herein, a nephew, the effect of the codicil is to give the entire residuary estate to the grandson Carroll Pettefer. Mrs. Carroll died May 14, 1936. On May 21, 1936, the original will and the codicil thereto were admitted to probate, in the Probate Court of Greene County, as her last will and testament. This action contesting the validity of the codicil followed. Carroll Pettefer and Moody the trustee named in the codicil are defendants.

None of the usual grounds of a will contest are relied upon. Contestant does not allege testamentary incapacity, and specifically disclaims fraud or undue influence. The substance of the petition is, that subsequent to the execution of the will of January 19, 1935, Mrs. Carroll acquired a promissory note for $6500 secured by a deed of trust on real estate; that she decided and desired, by a codicil to her will, to bequeath the note and deed of trust as a specific bequest to her grandson Carroll Pettefer; that she directed a lawyer to draw a codicil providing only for the disposition of the note and deed of trust, in trust, as a specific bequest to the grandson, and no more, and that the "provision and terms of said will should in all other respects remain unchanged;" that in violation of her instructions the lawyer inserted the provision disposing of the residuary estate in addition to the specific bequest of the note and deed of trust, and that in doing so he did not "realize that by the language" so employed "the residuary clause of said will was or would be in any manner changed or altered" and "did not become aware of said fact until the death" of Mrs. Carroll; that on the date same was executed the lawyer presented the codicil to Mrs. Carroll and represented to her that it "was as she had directed;" that she "did not read said pretended codicil nor was same read to her;" that she "executed same understanding and believing at the time" that it "had been prepared as she had directed and relying upon the representations made to her by said attorney . . . and without knowledge that her said lawyer had violated her instructions in the preparation of same;" and that, therefore, the writing signed, under the circumstances alleged, "was not the codicil of Mary J. Carroll." The petition disclaims any fraud or intentional deception on the part of the lawyer who wrote the codicil and states that his representations to Mrs. Carroll that the codicil "as drawn by him was in accordance with her instructions . . . were made . . . innocently in good faith . . . and without any intention on his part to mislead or deceive."

Since testamentary capacity is undisputed and the execution of the codicil, in conformity with the formalities required by statute, is not alleged, shown or claimed to have been in any-wise induced by, or tainted with, fraud or undue influence, contestant relies solely upon an alleged pure mistake. Assuming, without deciding, that substantial evidence tending to show that the codicil was executed under the circumstances alleged would sustain a finding against it, nevertheless in this instance, the trial court, as the trier of fact, made a finding sustaining the codicil. This brings us to the contention, which contestant, as appellant, makes here, that the evidence conclusively shows that by reason of the alleged mistake the testatrix did not know the contents of the writing which she signed and executed, and that it disposed of the residuary estate, and there-

fore the trial court should have given contestant's peremptory instruction directing a finding, as a matter of law, that the codicil is not testatrix's will.

The estate consisted of five parcels of real estate appraised at an aggregate value of $8650 and notes, bonds, stocks, U. S. Government obligations, cash and other items of personal property aggregating $50,353.57, the total appraised valuation being $59,003.57. The undisputed, uncontradicted evidence is, that Mrs. Carroll was a well educated and a very intelligent woman; that she successfully and profitably managed her own business affairs and exercised sound judgment in her investments; and that at the time she executed the codicil she was of sound mind, and in good health, her hearing and sight unimpaired, and she was not handicapped by any mental or physical infirmity or impediment.

Prior to the trial of the cause the defendant Charles W. Moody, who testified as a witness for proponent, the trustee named in the codicil, resigned as such trustee and renounced all interest he may have had as such trustee. The evidence as to the circumstances leading up to and connected with the execution of the codicil is found in the testimony of the witnesses for proponent Carroll Pettefer, a summary of which follows.

Moody was engaged in the loan and investment business in Springfield. He had several business transactions for Mrs. Carroll, over a period of five or six years, involving investments and had both bought "investments from her" and "sold securities" to her. In June, 1935, he "sold her the loan" represented by the Howell-Frederick note for $6500 secured by a deed of trust on real estate. Before purchasing this loan Mrs. Carroll personally viewed the real property securing the note and conditioned her purchase upon the approval by a lawyer of the title of the realty. Moody suggested that she employ a lawyer having an office in the same building in which Moody's office was located, and who had done some legal work for him, to examine the abstract of title and report thereon which Mrs. Carroll did. The lawyer made a written report approving the title and Mrs. Carroll purchased the note. Moody testified that shortly thereafter Mrs. Carroll stated to him that the purchase of the $6500 Howell-Frederick note "changes my assets and I want to change my will so as to leave that note to Carroll Pettefer in trust" and that she would like for him "to handle it as trustee;" that she wanted the trust to continue until Carroll was thirty years old "then the note was to be turned over to him or the proceeds of the note;" that he told her: "I don't understand such proceedings" and "you will have to have a lawyer do it." Grove S. Dow, an associate of Moody in the investment business, stated that shortly after Mrs. Carroll purchased the Howell-Frederick note she told him, "at her house," that she wanted to make some changes in her will but "she

didn't say what they were'' except ''something about. wanting to give some property to Carroll Pettefer'' and that he suggested she have an attorney ''draw it up.'' She thereupon consulted the lawyer whom she had employed to examine the title when she purchased. the Howell-Frederick note. It appears that there was no other person present at this conference and the lawyer testified that, at that time, she ''told me what she would like to do in regard to her will and codicil;'' that she did not, at that time, give him the date of her will but that he obtained that information from her ''a day or two later;'' and that he never at any time saw the original will nor was he informed as to its provisions. The lawyer further testified that, within a few days after his conferences with Mrs. Carroll, he ''prepared the codicil just as it appears'' and on the morning of July 10, 1935, the date of the execution thereof, he delivered it to Moody. Thereupon Moody called Mrs. Carroll, by telephone, and told her the codicil was at his office ready for her examination and execution and she came to Moody's office that afternoon. The Moody office suite consisted of more than one room. There was no other person present in the room of the Moody office suite at the time Mr. Moody submitted the codicil to Mrs. Carroll. Moody testified, that ''she came in and sat down at the desk;'' that he handed her the codicil; that while she held it in her hand, and was looking at it, he stood ''by her side and read it aloud to her;'' that he ''read it word for word;'' that he ''read the whole thing to her;'' that he read ''the document exactly as it is written;'' and that after reading it to her he ''asked her if that was all right and she said it was.'' Moody then called the lawyer who had prepared the codicil and he shortly came to Moody's office. When the lawyer came into the room where Mrs. Carroll was waiting to execute the codicil Moody went into another room of the office suite. The lawyer then called Moody's associate Dow into the room to act as an attesting witness. Both Dow and the lawyer testified that after they went into the room with Mrs. Carroll the codicil was not read to her by either of them. The lawyer testified that he picked up the codicil and ''handed it to her;'' that ''she looked at it awhile, I couldn't say for sure whether she read it or not . . . I thought she did;'' that he then told her ''that the codicil was drawn as she had directed it to be drawn and she signed it.'' Dow and the lawyer signed as attesting witnesses. No question is made but that the codicil was duly executed in accordance with the formalities required by statute and that the testatrix was at the time of sound mind and disposing memory. After the execution of the codicil testatrix immediately left Moody's office taking the codicil with her and it was retained in her exclusive possession from and after that time until her death, approximately ten months later, when it was found attached to her will of January 19, 1935.

Taking the foregoing facts and circumstances, and the logical and reasonable inferences of fact most favorable to proponent arising therefrom, as true, as we must do in ruling contestant's motion for a directed finding, the following appears. Mrs. Carroll had spoken to Moody about changing her will and in that connection stated that she contemplated giving her grandson Carroll Pettefer the Howell-Frederick note but would put it in trust until the grandson attained the age of thirty years and asked Moody to serve as trustee. She also told Dow that she wished to change her will, at which time "she said something about wanting to leave some property to Carroll Pettefer." She consulted the lawyer, whom she had formerly employed to examine the title of the real estate securing the Howell-Frederick note, no other person being present at the conference. At that time she gave him directions as to the terms and provisions she wished incorporated in the codicil. Within a few days thereafter the lawyer wrote the codicil "just as it appears." In plain, unambiguous language the instrument he prepared devised the Howell-Frederick note, *"and all the rest, residue and remainder of my estate, both real and personal, which remains after payment and settlement of all specific bequests and devises made in my will dated 19th day of January 1935"* to Moody in trust for her grandson Carroll Pettefer "until he shall attain the age of thirty years," etc. The codicil was read to her by Moody, in the manner heretofore stated. It was the lawyer's impression that she herself read it after he arrived at Moody's office to direct the execution of the instrument. She was of sound mind, an educated, alert, intelligent woman, versed in business affairs. She was under no mental or physical impediment that could be said to have likely prevented her, under such circumstances, from understanding the plain, unambiguous language of the instrument. We think it could properly and reasonably be inferred that she did know the contents of the instrument when she executed it. And the further inference is permissible, that had the instrument by the plain residuary provision thereof exceeded or been contrary to her testamentary purpose and her instructions to her lawyer she would have objected and required a correction, but after the careful reading with instrument before her, as related by Moody, Mrs. Carroll expressly approved the codicil as written. It is well nigh inconceivable that, within but a few days after she had given him instructions for the codicil, the lawyer would have written the residuary provision into the codicil had no instructions whatever been given therefor and have stated to testatrix at the time of execution that the codicil was drawn in accordance with her instructions. It will be borne in mind that no fraud, conspiracy, or bad faith, is involved but is expressly disclaimed.

The contestant in support of his contention, as appellant, that he was entitled, as a matter of law, to a directed finding that the codicil

was not testatrix's will relies largely upon the testimony of the lawyer on cross-examination. This apparently on the theory that such testimony in itself, and alone, suffices to conclusively show that testatrix did not know the contents of the instrument she executed as a codicil and that as the result of a pure mistake she executed an instrument different from that which she intended and thought she was executing, and that such testimony, as a matter of law, destroys the effect of all other evidence in the case, heretofore set out and discussed, tending to show that she did know and understand the contents of the instrument at the time she executed it. On the cross-examination the lawyer testified that he graduated from a law school in 1933 and entered the practice of law at Springfield in August of that year. We set out *verbatim* the more pertinent parts of the cross-examination, stressed by appellant.

"Q. She told you and the instructions she gave you were to draw a codicil to the will and to give the note and deed of trust to Mr. Moody in trust for Carroll Pettefer; that is correct? A. Yes, sir.

"Q. And that is all your were to do when you drew the codicil, that is correct? A. Yes, sir.

"Q. And she told you she did not want any other changes made in the will, didn't she? A. Yes, sir.

"Q. Now at that time you had never drawn a codicil in your life, had you? A. That is right.

"Q. That means you understood you were inexperienced in the drawing of codicils at that time? A. Yes, sir. . . .

"Q. She told you she wanted Mr. Moody as the trustee? A. Yes, sir.

"Q. And she told you likewise that she wanted it to run until Carroll Pettefer was thirty years of age? A. Yes, sir.

"Q. And was that the sum total of her instructions to you? A. Yes, sir. . . .

"Q. After several days you prepared the codicil in question? A. Yes, sir.

"Q. And prepared it in typewriting just as it appears here? A. Yes, sir. . . .

"Q. Now it is true that nothing was said by Mrs. Carroll prior to the 10th day of July, or on the 10th, that she wanted anything done other than to make a codicil which would give this note and deed of trust to Mr. Moody in trust for Carroll Pettefer? A. That is correct.

"Q. And you understood, didn't you that the paper which you drew did that and no more? A. Yes, sir.

"Q. In other words you attempted in the drafting of this codicil to bequeath only the Howell-Frederick note and deed of trust to Mr. Moody in trust for Carroll Pettefer and to do nothing else but that; that is true? A. Yes, sir; that was my intention.

"Q. And that was the directions and instructions that Mrs. Carroll had given you? A. Yes, sir.

"Q. And when you told Mrs. Carroll to execute that codicil, you told her in substance that the codicil as written was in accordance with the directions and instructions which she had given to you? A. Yes, sir. . . .

"Q. Now when did you first learn that the codicil as drawn bequeathed to Mr. Moody in trust for Carroll Pettefer anything more than the Howell-Frederick note and deed of trust? A. Well, it was suggested to me at a meeting some time after Mrs. Carroll's safety box, I take it, was opened in the office of Mr. H. B. McDaniel in the Union National Bank.

"Q. And is this true, that it was not your intention when you drew this codicil to use any word or phrase that would in any manner change the residuary clause of the will? A. That is true."

Thus by the means of his series of "yes, sir" answers to the questions propounded on cross-examination the lawyer, who was employed to write the codicil for Mrs. Carroll pursuant to her instructions, within a few days thereafter wrote it in plain, unambiguous language and declared at the time it was executed that it was drawn in accordance with her instructions, now at the trial of this cause, approximately eight months after the death of testatrix and a year and a half after the execution of the codicil, says that no instruction, of any kind whatsoever, was given to him as to the disposal of the residuary estate, that for no reason, which he can now assign, he wrote the very plain residuary provision into the codicil, and that he did not so much as know the meaning of the language which he used, that is, he did not know the meaning of the words, "rest, residue and remainder of my estate, both real and personal, which remains after the payment of all specific bequests and devises made in my will dated January 19, 1935." The residuary provision could hardly have been couched in plainer or simpler language. It must be assumed that the lawyer was a man of average intelligence and education and there is no intimation or suggestion that he was subject to any mental aberration or mental or physical impediment, or was not in full possession of his faculties, when he wrote the codicil and declared that it was written in accordance with the instructions given. It is well nigh incredible, and the trial court would, we think, have been justified in so considering the lawyer's testimony given on the cross-examination, that without any instruction to that effect by Mrs. Carroll, without any conscious purpose in doing so, and without knowing the meaning of the plain simple language he used, he wrote the residuary provision into the codicil.

We have pointed out the evidence of a direct and substantial character tending to show that the codicil was read to Mrs. Carroll and expressly approved by her, also that there was circumstantial evi-

dence, of a substantial nature, that she herself read it, and the reasonable inference arising therefrom in favor of proponent that, in view of the plain and unambiguous language used, she knew and understood the contents of the instrument which she executed. We think it quite apparent that substantial evidence was adduced sufficient to support a finding sustaining the codicil as the will of testatrix, and that the trial court was not in error in refusing contestant's motion to declare, as a matter of law, that the codicil was not her will. Contestant's evidence was limited to testimony tending to impeach the testimony of Moody that he had read the codicil to Mrs. Carroll. Therefore, assuming, without so deciding, that an alleged pure mistake of a scrivener in writing a will, with no tinge of fraud or undue influence involved, may be made the basis for the contest of a will, admittedly executed by a thoroughly competent testator in accordance with the formalities required by statute, in the instant case the evidence as a whole makes a submissible issue of fact to be determined by the trier of fact, in this instance, the trial court, and the credibility of the testimony and the weight and value of the evidence was for the trier of fact. The finding on the issue of fact was in favor of proponent and since there was substantial evidence to support such finding it is conclusive.

Contestant (appellant) bottoms his case, and his contention here, largely on two decisions of this court; Cowan v. Shaver, 197 Mo. 203, 95 S. W. 200, and Bradford v. Blossom, 207 Mo. 177, 105 S. W. 289. The two cases are exhaustively treated in the briefs, the facts analyzed and certain language of the opinions stressed.

Cowan v. Shaver was a contest of the will of John Cowan. Cowan left surviving him, his wife, Polly, and seven sons and two daughters. His estate was of a value of about $10,000. The will in question gave each of his children the sum of $30.00 and all the remainder of his property to his wife Polly. Shortly after Cowan's death his widow Polly died testate. Her will left "the principal part" of her estate to the daughter Pinky Shaver. The seven sons and the other daughter of John Cowan then brought this contest of the will of John Cowan making their sister Pinky Shaver the defendant therein. One John Shaver was a brother of Polly Cowan, testator's wife. Pinky Cowan, daughter of John and Polly Cowan, had married a son of her uncle John Shaver. The petition charged testamentary incapacity, and undue influence exercised by Polly Cowan (the wife), Pinky Shaver (the daughter) and John Shaver (brother-in-law). The contestant's evidence was that when John Cowan executed the will in question he was seventy-five years of age, illiterate, and "quite feeble in body and mind;" that "his mind was not only weak but diseased;" "that he had not sufficient mind and memory to understand the nature of the will he was attempting to make;" that he was wholly unable to attend to his business affairs and had

placed same entirely in the hands of his brother-in-law John Shaver who managed his business affairs for him until his death; that the brother-in-law John Shaver was the active agent in bringing about the execution of the purported will and that the paper was executed in Shaver's home and under his supervision. Contestant's evidence further was that on the date of the execution of the will testator was taken by his wife and daughter, Pinky Shaver, to the residence of John Shaver "where a man to draw the will had been requested to come and two men to witness it;" that the man who was present to write the will was "a farmer and also sometimes taught school;" that he had never written a will before and did not know what he had been called to John Shaver's house to do. The writer of the will, a witness for defendant "testified that he wrote it at the dictation of the testator, but both he and another one of the subscribing witnesses, who was also a witness for defendants, were under the impression that the testator had expressed the purpose to give the property to his wife for life and to his children equally at her death." "On the part of the defendants the testimony tended to show that John Cowan was of sound and disposing mind and memory when he executed the will" and that it was his own free and uninfluenced act. There was evidence that John Shaver gave the man who wrote the will a form of will for his guidance though "just how far" the will as written conformed "to that form does not appear." It will be noted that there was no evidence that the will was ever read to or by the testator. The case was given to the jury under instructions authorizing a verdict against the will "if the jury should find that" Cowan "was of unsound mind at the time of its execution or that it was obtained by undue influence." The verdict was that the writing was not the will of John Cowan and defendant appealed from the judgment thereon.

One complaint made by appellant was directed to contestant's instruction numbered 1, "the closing sentence of which was: 'If he (John Cowan) signed the will in question with the understanding and belief that such will conveyed only a life estate to his wife . . . with remainder to his children in equal parts, then the will offered is not his will and you should so find.' " The preceding part of the instruction is not set out. It will be remembered that there was conflicting evidence on the issue of testamentary capacity and that of undue influence and conspiracy. In discussing the issue submitted by the quoted part of the instruction the opinion says: "If, therefore, in their effort to prove the due execution of the will, the proponents themselves *show that the paper offered is not what the testator was made to believe it was* when he signed it, it cannot be adjudged to be his will even in the absence of any averment to that effect in the petition of the contestants. The ultimate question in the case is, is this the last will and testament of the alleged testator? and

the affirmative of that issue is on the proponents. . . . . There was sufficient, in the evidence introduced by the proponents themselves, to justify the court in submitting to the jury the question contained in this instruction. The man who wrote the will and witnessed it and one of the other subscribing witnesses said they understood the testator to say in effect that he wanted the property to go to his wife for life and to his children equally after her death. That wish is at such variance with the terms of the alleged will that it is a strong circumstance going to show that the man did not comprehend the effect of the instrument he was signing. Mere feebleness of body and mind are not alone sufficient to avoid a will, but they are facts to be considered when the question of the validity is on trial, and they are to be considered with especial reference to the facts of the particular case. Here was an old man conceded to be feeble in body and mind, in the keeping, as it were, of his trusted business agent, his own wife and his own daughter, illiterate, with no one present to advise him except those who were instrumental in bringing about the execution of this paper. *Under those circumstances,* if he thought he was signing a will that gave the property to his wife for life and to his children equally at her death, then, *whether the act was the result of a diseased mind, or of a feeble mind imposed upon, the result in law was the same*—the paper he did sign was not his will and the court was right in so instructing the jury.'' (Italics ours.). It was held that *under the circumstances pointed out* (there are no comparable circumstances in the present case) there was an issue of fact for the jury as to whether the testator was made to believe when he signed it that the writing was the will he directed be drawn when in fact it was not. The court did not hold that the circumstances required a directed verdict against the will, as a matter of law, but only that an issue of fact was made for the jury. The foregoing excerpt from the opinion suffices to disclose the basis for the ruling.

In Bradford v. Blossom, supra, this court did hold that, under the evidence, the trial court should have directed a verdict that the writing in question, was not the will of Mrs. Bradford. The facts are so lengthy it is difficult to summarize the evidence in that case so as to give anything like a complete factual view of the situation there ruled. Mrs. Bradford, the testatrix, was a ''frail'' woman, ''almost deaf,'' and ''subject to sinking spells, during which times she was wholly incapacitated to transact business.'' She was a widow with two children, an unmarried adult son, Frank, and a married daughter Carrie Ryan, who had four children at the time the will, in question, was executed. The two children, Frank and Carrie, brought the contest alleging fraud and undue influence. Howard Blossom, named as executor and trustee in the will, was the sole defendant. For many years prior to her death Blossom had been Mrs. Bradford's confiden-

tial and trusted business advisor. The will in contest was executed in 1893. Mrs. Bradford had executed a will in 1886 whereby she devised one half of her estate to Blossom and another, in trust, for the benefit of her married daughter Carrie for life, the net income therefrom to be paid to Carrie during her life, and upon her death the remainder to Carrie's children in fee, and the other half of her estate to Frank in fee. Frank afterwards became addicted to the use of intoxicating liquors which caused her to apprehend he might squander the interest devised in fee to him and she concluded to change her will and also place Frank's interest in trust for him during life, in the same manner she had devised Carrie's interest, with remainder in fee to her grandchildren. In 1893 she advised her confidential agent Blossom of her desires, told him she wanted him to serve as executor and sole trustee and asked him to have a new will prepared. The evidence is conclusive that her directions to Blossom as to the provisions of the will were limited and confined to the intention in regard thereto above stated. Without further consulting her Blossom prepared a lengthy memorandum for a will, of which Mrs. Bradford had no knowledge, and gave directions to his lawyer to draw a will embracing the terms thereof. The lawyer prepared a rough draft of a will and submitted it to Blossom and discussed it with him. Without consulting Mrs. Bradford, or submitting the rough draft to her for her examination and advice, Blossom made numerous additions and interlineations therein and returned it to his lawyer with directions to draw the will in conformity therewith. The lawyer thereupon wrote the will in the final form in which it was executed. It was a lengthy and complicated document and violated and exceeded the instructions given by Mrs. Bradford in numerous respects. There was no mistake by the lawyer in drawing the will. The evidence showed that it conformed to Blossom's memoranda and the rough draft as amended by him. Apparently the variations from Mrs. Bradford's instructions were intentionally made by Blossom. The will as drawn gave the entire estate to Blossom in trust not only for Mrs. Bradford's children but also for their children, and gave Blossom unlimited powers as trustee. It also provided that in a certain contingency an interest in the estate should go to Blossom's wife. The lawyer who drew the will did not know Mrs. Bradford, had never seen her, and never at any time consulted with her about the will. The final draft was delivered to Blossom. Later Blossom, accompanied by Mrs. Bradford, brought the will to the lawyer's office for execution and retired during the short interim it was being executed. The will was not read to her, or by her, at that time, nor was any explanation made as to the contents. The mere formalities of execution were carried out, nothing more, the lawyer and his stenographer attesting. Whereupon Blossom re-

turned and he and Mrs. Bradford took the will and went away together. There was no evidence tending to show that Mrs. Bradford ever read the will, or that it was ever read to her, or that she was informed of or knew the contents. The verdict of the jury sustained the will. This court pointed out; "There is not a scintilla of evidence which tends to show that Mrs. Bradford ever knew anything about the contents of this will or the changes that were made in the original draft thereof, and all that the record discloses, so far as relates to her connection with the will, is the simple fact that she signed it and requested the attesting witnesses to sign it as witnesses to her will. . . . We have carefully read and reread the record before us . . . and have been unable to find any evidence tending to show she had any knowledge of the contents of the will as drawn. . . . The evidence in this case clearly shows that the relation of trust and confidence existed between him (Blossom) and the testatrix at the time of the execution of the will, which fact, taken in connection with the interest he and his wife took under the will, shifted the burden of proof upon him to show by a preponderance of the evidence that she not only had the opportunity of reading the will, but that she did read it and understood its provisions, and what disposition she was making of her property. It was also incumbent upon him to show that she acted freely, from her own volition, and that the execution of the will was not the result of fraud or undue influence perpetrated upon her. . . . The defendant having completely failed to comply with this rule of law, it then became the duty of the trial court to direct a verdict for the plaintiffs."

The statement we have made of Bradford v. Shaver suffices to mark the distinction between that case and the instant case. In that case the uncontradicted evidence was that the testator's confidential and trusted agent caused a will to be prepared which was at variance with her directions in numerous vital and material respects, to the interest and profit of the agent himself, who was named as trustee, and there was no evidence whatsoever tending to show that she read the instrument or that it was read to her or that she knew or was ever informed of the contents of the instrument. In the instant case there was not only substantial evidence to support a finding that the testatrix knew the contents of the codicil but also evidence of a sufficiently substantial nature to warrant an inference of fact that it was drawn in accordance with her instructions, as the lawyer who drew it at the time declared, making a fact issue.

As stated, contestant's case is based on alleged pure mistake. No element or circumstance of fraud or undue influence is involved. Of a pure mistake as to the contents of a will, Page on Wills (2 Ed.), section 170, page 287 (citing cases) says: "Since mistake is essentially an unconscious ignorance or forgetfulness about material

facts, it is held, by the great weight of authority, that mistake as to the contents of the instrument depends on testator's opportunity to acquaint himself with its contents. If the will is read by testator, or if he has a fair opportunity to read it, or if it is read to him, it is generally held, in the absence of fraud or undue influence, that he is to be treated as though he knew its contents and a variance between the instructions which he has given and the contents of the will as executed does not render the will invalid." Some cases hold, in effect, with what is said in In re Gluckman's Will, 87 N. J. Eq. 638, 641: "Where a testator, in addition to complete testamentary mental capacity, is in full enjoyment of average physical and educational faculties, it would seem that in the absence of fraud or of undue influence, a mistake, in order to defeat probate of his entire will, must in substance or effect really amount to one of identity of the instrument executed; as, for instance, where two sisters, in one case, or a husband and wife, in another, prepared their respective wills for simultaneous execution, and through pure error one executed the other's, and vice versa. . . . Short of this, however, or of something amounting, in effect, to the same thing, it is against sound public policy to permit a pure mistake to defeat the duly solemnized and completely competent testamentary act. It is more important that the probate of the wills of dead people be effectively shielded from the attacks of a multitude of fictitious mistakes than that it be purged of wills containing a few real ones. The latter a testator may, by due care, avoid in his lifetime. Against the former he would be helpless." [See, also, Lipphard v. Humphrey, 209 U. S. 264; and Munnikhuysen v. Magraw, 35 Md. 280, 287.]

We have ruled that under the evidence an issue of fact was made for the jury, or the trier of fact, in this instance the trial court. Therefore the finding thereon sustaining the codicil is conclusive. It follows that the judgment of the trial court establishing the original will and the codicil thereto as the last will and testament of testatrix should be affirmed. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.